IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| VINCENT E. FOSCATO, on behalf of Himself and as next friend of his minor son, VOSS G. FOSCATO; and DANIELLE P. FOSCATO, | ) ) ) ) | |
| Plaintiffs, | ) ) | Cause No.: 2:21-cv-4240-MDH |
| v. | ) ) | |
| CHAPARRAL BOATS, INC.; XTREME MARINE CORPORATION, d/b/a XTREME TOWERS PRODUCTS; and GREGORY S. LAJUENE, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| XTREME MARINE CORPORATION, d/b/a XTREME TOWERS PRODUCTS, | ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| C&C RIDING THE WAVES, LLC f/k/a PREMIER 54 MOTOR SPORTS, LLC | ) ) ) | |
| Third-Party Defendant. | ) ) | |

**DEFENDANT CHAPARRAL BOATS, INC.'S SUGGESTIONS IN SUPPORT OF
MOTION TO EXCLUDE EXPERT REPORT, TESTIMONY, AND OPINIONS OF
PLAINTIFF'S EXPERT KYLE MINDEN**

COMES NOW Defendant, Chaparral Boats, Inc., by and through undersigned counsel, and

for its Suggestions in Support of its Motion to Exclude the Testimony and Opinions of Plaintiff's

Expert Kyle Minden, and in support thereof, states:

1

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... 2

Table of Citations ......................................................................................................... 3

Introduction ................................................................................................................... 4

Law and Argument ........................................................................................................ 5

    I.      Standard for exclusion of expert testimony ............................................5

    II.    Minden's opinions fail to meet the standard for admissibility of expert
          testimony pursuant to *Daubert*................................................................8

          A.     Minden is not qualified to offer his opinions...............................9

          B.     Prior fatigue cracks on other towers are nothing more than a
               red herring meant to distract from the true cause of the accident,
               running into a concrete bridge column ......................................12

          C.     Minden made no effort to engage in any testing to confirm that
               his opinions have any valid basis in reality ...............................15

               i.      Minden made no effort to determine the forces exerted
                      on the tower when it collided with a concrete bridge
                      column at 30 mph........................................................16

               ii.     Minden performed no testing to determine if the lack of
                      stiffness in the tower was causative of the tower collapsing .........18

                iii.    Minden performed no testing to accurately conclude that lack
                      testing on the flat gunnel was causative of the tower collapsing ...23

                iv.    Minden does not know if a perfect weld on the tower at the
                      time of impact would have made any difference in the
                      tower collapsing ........................................................27

Conclusion ................................................................................................................. 28

# TABLE OF CITATIONS

**Case Law:**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................................. 5, 6, 8

*Prince v. Michelin N. Am., Inc.,* 248 F. Supp. 2d 900 (W.D. Mo. 2003) ................................... 5, 6

*Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).........................................................6, 8

*Anderson v. Raymond Corp.,* 340 F.3d 520 (8th Cir. 2003) ......................................................6, 29

*Nelson v. Am. Home Prod. Corp.,* 92 F. Supp. 2d 954 (W.D. Mo. 2000) ............................ 6, 7, 29

*Glastetter v. Novartis Pharms. Corp.,* 252 F.3d 986 (8th Cir. 2001) ........................... 6, 15, 17, 29

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)...............................................................7, 8, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995) ....................... 7, 29

*McDowell v. Brown,* 392 F.3d 1283 (11th Cir. 2004) ....................................................................7

*In re Wholesale Grocery Prod. Antitrust Litig.,* 946 F.3d 995 (8th Cir. 2019) .............................8

*Thornton v. Gray Auto. Parts Co.,* 62 S.W.3d 575 (Mo.App. W.D.2001) ................................. 14

*Peters v. Gen. Motors Corp.*, 200 S.W.3d 1 (Mo. Ct. App. 2006) ............................................. 14

*Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210 (8th Cir. 2006).................................21, 22

**Rules:**

Fed. R. Evid. 702 ............................................................................................................ 5, 6, 7, 9

#30202027 v1

## INTRODUCTION

This lawsuit arises out of an allision that occurred on June 25, 2021 wherein Greg LaJuene, while operating a 297 SSX Chaparral boat on the waters of the Lake of the Ozarks, ran into a concrete bridge column at approximately 30 miles per hour in broad daylight ("LaJuene Accident"). On the subject boat at the time of the incident was Greg LaJuene, Callie Bilyea, Thomas Voss, Pamela Voss, Vincent Foscato, Danielle Foscato, Finn Foscato (minor), Sloane Foscato (minor), and Voss Foscato (minor). None of the occupants, including the minor children, were wearing life jackets. As a result of the allision with a concrete bridge column, a tower affixed to Greg LaJuene's boat collapsed and seven of the occupants were ejected. Plaintiffs, Vincent Foscato, Danielle Foscato and their son, Voss Foscato are seeking damages arising out of the LaJuene Accident. Following the incident, Gregory LaJuene was cited for failing to provide life jackets and failing to operate a boat with the highest degree of care.

The subject boat was outfitted with a double hinged electric folding hardtop tower manufactured by co-defendant Xtreme Tower Products. Plaintiffs claim that the tower is defective because it broke after running into the concrete bridge column at approximately 30 mph. The tower is designed to provide shade from the elements and pull water skiers or wake boarders behind the subject boat. The tower is not designed as a roll bar. By way of an example and to give this Court context on the allegedly defective product, below is an undamaged example of the tower structure on a Chaparral 297 SSX:

4



Plaintiffs retained Kyle Minden as an expert in this matter. According to his expert report, it is Kyle Minden's opinions that the tower was defective in its design, testing, manufacture, and installation. *Exhibit A*, Kyle Minden's Expert Report, Pg. 65-69. But Mr. Minden's opinions are incomplete, speculative and not based on any scientific testing, data, or any other sort of methodology. Minden fails to satisfy the mandatory requirement of reliability for his opinions to be admissible as an expert and should therefore be excluded *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Accordingly, Minden's opinions should be struck for failing to satisfy the mandatory *Daubert* requirements for the admissibility of expert testimony.

## LAW AND ARGUMENT

### I. Standard for exclusion of expert testimony.

As a preliminary matter, "the proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Prince v. Michelin N. Am., Inc.,* 248 F. Supp. 2d 900, 901 (W.D. Mo. 2003). Under Rule 702 of the Federal Rules of Evidence, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702. The question of whether Mr. Minden's opinions are admissible under FED.R.EVID. 702 is controlled by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Under *Daubert*, U.S. District Courts must act as gatekeepers to "insure that proffered expert testimony is both relevant and reliable." *Anderson v. Raymond Corp.,* 340 F.3d 520, 523 (8th Cir. 2003). Potentially pertinent factors to be considered in the court's gatekeeping function include whether the expert's theory or technique, (1) can be (and has been) tested; (2) has been subjected to peer review and publication; (3) has a known or potential "rate of error" and "standards controlling the technique's operation," and (4) enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 592–94.

Additional factors developed in the cases following *Daubert* include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Prince,* 248 F. Supp. 2d at 902. Evidence of an association may be sufficient for formulation of a hypothesis that can later be tested and confirmed, but it is not proof of causation in the courtroom or the scientific community. *Nelson v. Am. Home Prod. Corp.,* 92 F. Supp. 2d 954, 969 (W.D. Mo. 2000). The court must ensure that expert opinion is "supported by appropriate validations – i. e., 'good grounds,' based on what is known," and the court must separate valid opinions from "subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.,* 252 F.3d 986, 988-89 (8th Cir.

#30202027 v1

2001). In some cases, a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *See Gen. Elec. Co.*, 522 U.S. at 146.

When determining the reliability of a proffered expert's opinion, courts have discounted the reliability of experts who formed their opinions only within the context of litigation. *Nelson,* 92 F. Supp. 2d at 967; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (*Daubert II*) ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science"). Such considerations recognize that a scientific expert's "normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Nelson*, 92 F. Supp. at 968. That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were "derived by the scientific method." *Daubert II,* 43 F.3d at 1317. If the proffered expert testimony is not based on independent research, the party must come forward with other ***objective, verifiable evidence that the testimony is based on "scientifically valid principles."*** *Id.* at 1317-1318 (emphasis added).

Regardless of whether the court considers some or all of these factors, at all times its focus must be on the methodology and principles used by the expert to reach his conclusions, not the conclusions themselves. *McDowell v. Brown,* 392 F.3d 1283, 1298 (11th Cir. 2004). A trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. *See* Fed. R. Evid. 702; see also Advisory Committee's Note on Proposed Fed. Rule Evid. 702, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and Evidence: Request for Comment 126 (1998) (stressing that district courts must "scrutinize" whether the "principles and methods" employed by an expert "have been properly applied to the facts of the case"). "[A]ny

#30202027 v1

step that renders the analysis unreliable renders the expert's testimony inadmissible. <u>This is true whether the step completely changes a reliable methodology or merely misapplies that methodology</u>." *In re Wholesale Grocery Prod. Antitrust Litig.,* 946 F.3d 995, 1001 (8th Cir. 2019)(emphasis added)

In *Kuhmo Tire,* the Supreme Court held that the gatekeeping obligation under *Daubert,* which requires inquiry into the relevance and reliability of expert testimony, applies not only to "scientific" testimony, but to all expert testimony. *Kuhmo,* 526 U.S. at 147. The objective of such a requirement is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

## II.    Minden's opinions fail to meet the standard of *Daubert* and its progeny and thus, must be excluded.

To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Daubert,* 509 U.S. at 589–90. To show that the expert testimony is relevant, the proponent must show that the reasoning or methodology in question is applied properly to the facts in issue. *Id.* A court should not admit opinion evidence that is "connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co.,* 522 U.S. at 146.

Under these standards, Minden's opinions are not scientifically relevant or reliable to warrant admission into evidence in this case. In fact, despite claiming he follows the scientific methodology in his investigations, he did not employ such a methodology in this case.

Minden's report and subsequent deposition testimony demonstrate Minden completed two functions as an expert in this case: first, he formed certain hypotheses – though he failed to test

them; second, he acted as a scrivener, literally - he merely documents historical warranty issues Chaparral had with a number of boat towers, but admits these warranty issues and all emails relating to them were dissimilar to the case at hand.

Minden's hypotheses remain untested, and Minden has no admissible opinions related to any "defect", or that a defect caused or contributed to cause the accident. His purported testing and methods (or lack thereof) are based on flawed reasoning and improper data. Minden's opinions and the defects with them do **not** go to the weight of his testimony because, as demonstrated herein, they are scientifically flawed mere *ipse dixit*.

A. **Minden is no expert regarding boats - he is not qualified by knowledge, skill, experience, training or knowledge and should not be permitted to opine on a boat defect, or crashworthiness of boats.**

In order to testify as an expert in this matter, Minden must be qualified as to the subjects being proffered. Minden is proffered as a metallurgical expert to testify as to the alleged defective nature of the subject boat and its tower, and opines on other topics, including crashworthiness. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**Minden is not qualified to offer opinions regarding metallurgy**

Minden is not qualified to offer metallurgical opinions in this case. He graduated with a degree in mechanical engineering in 1990 from Kansas State. *Exhibit B*, Deposition of Kyle Minden, 10:1-10. Following his degree, Minden worked for a company that designed and manufactured propane tank type products. *Exhibit B*, 10:13-11:3. In 2002, he joined his current employ at Engineering Design & Testing Corporation. *Exhibit B*, 20:18-22. Minden

acknowledged he could have degreed in metallurgy, but he does not possess such a degree. *Exhibit B*, 34:2-14. He further acknowledged one could be certificated in metallurgy, but he does not possess any such certification. *Exhibit B*, 34:2-24. Minden's experience in metallurgy is garnered from on the job training from his boss[1] at Engineering Design & Testing during litigation matters. *Exhibit B*, 35:22-36:20. He holds no certifications in welding. *Exhibit B*, 42:11-12.

> **Minden is not qualified to offer opinions relating to boat defects, or crashworthiness of boats.**

Minden offers hypothesis about "defects" in the subject boat. But in his career Minden has never investigated a single boat accident and has never worked for a boat manufacturer. *Exhibit B*, 42:23-43:2; 62:3-8. In fact, during his career, the only time Minden has performed an investigation involving a boating collision occurred when a large dredge ship sank because there was a hole in the hull. *Exhibit B*, 29:19-30:25. He did not gain knowledge of recreational boats and standards working for a boat manufacturer – he has never worked for one. *Exhibit B*, 42:23-43:2; 62:3-8. Disturbingly, Minden has never read the standards promulgated by the American Boat and Yacht Council[2], and does not know anything about that National Marine Manufacturers Association. *Exhibit B*, 32:4-33:18. He has never looked at the Coast Guard Inland Marine Rules and Regulations. *Exhibit B*, 62:18-63:4.

Disturbingly Minden has no qualifications to offer an opinion on crashworthiness of boats. For example, Minden defines crashworthiness as "[p]rotects the occupants, remains its structure. In the case of a boat, you'd want it to remain afloat, which in this case it did. It was able to be

---

[1] It is ironic that Minden is later critical of Chaparral not having an engineer on staff when he himself received on the job training in metallurgy from a non-engineer.
[2] American Boat and Yacht Council is a non-profit organization that sets forth standards and technical information for the safe construction and maintenance of boats. *Exhibit C*, Deposition of Joseph Derie, 20:10-21:1; About ABYC - American Boat and Yacht Council (abycinc.org); National Marine Manufacturers Association is a voluntary organization that certifies that boats are manufactured in accordance with the standards and regulations set forth by the American Boat and Yacht Council. *Exhibit C*, 35:23-36:17.

restarted and made it safely back to short." *Exhibit B*, 215:11-18. But Missouri law would disagree. The second collision doctrine differs from the typical strict liability case in that the defect would not have produced any injury in the absence of an independent act which sets the injury producing cycle into motion. *Richardson v. Volkswagenwerk, A.G*., 552 F. Supp. 73, 79 (W.D. Mo. 1982). The source of the original independent act is irrelevant so long as the plaintiff's particular use of the product is reasonably foreseeable. *Id*. at 79. To recover under the second collision doctrine, the plaintiff has the burden of proving that the product was defective in condition or design when it left the manufacturer. To establish that the product was defective, plaintiff must show that he was injured while using the product in its intended manner. Further, the plaintiff must prove that the product was unreasonably dangerous; i.e., the product must be dangerous to an extent beyond that which would be contemplated by the user with ordinary knowledge common to the community. *Id*. Minden makes no effort to comport his "opinions" on crashworthiness to Missouri law, and has a fundamental misunderstanding of the concept of crashworthiness.

Minden's ignorance of the rules and regulations applicable to recreational boats is not a matter of cross examination, and it does not go to the weight of his testimony; it is a matter of qualification, and he is not qualified.

Minden has no experience working with or investigating boating accidents. Further, Minden holds no degrees or certifications in metallurgy, yet offers opinions on the topic. The only experience he has in metallurgy is solely through litigation, not independent research and investigation. Accordingly, Minden is not qualified to offer opinions in this matter on metallurgy, boats, or crashworthiness of boats.

11

**B.** **The Warranty Fatigue Issue has no relation to the tower break in the LaJuene Accident, and as such, it is improper for Minden to rely on such for any opinion.**

To support his contention the tower was improperly designed and manufactured, Minden illogically focuses on the Warranty Fatigue Issue. Before addressing the Warranty Fatigue Issue, one must understand the difference between a fatigue crack, and a ductile crack. A **fatigue crack** develops when there are repeated stresses on a particular part which causes a crack to form on the material when subjected to enough cycles. *Exhibit B*, 56:6-16. Conversely, a **ductile crack** is a crack that forms in the material when subjected to a single load that is higher than what the material can handle. *Exhibit B*, 60:6-9. In other words, a fatigue crack is caused by cyclic loads, while a ductile crack is caused by a single load larger than what the material can sustain.

Before the LaJuene Accident, Chaparral received warranty claims for approximately 60 towers. Minden describes these warranty claims in his report and writes:

"… Chaparral received at least 60 warranty claims regarding the 287/297 hardtop tower, with the majority of them being related to the recurring issues of cracking/fracture of the header attachment welds. These warranty claims largely centered on single header bar. Once the claims arose, Chaparral and Xtreme Towers developed a remedy, which included changing from a single header bar to a double header bar to provide additional lateral support. The subject boat had this change, such that at the time of the incident it had a double header bar."

*Exhibit A*, Pg. 36-37.

12

For reference, below is an engineering drawing depicting the double header bar being referenced by Minden.



Minden admits each of these prior warranty claims dealt with fatigue cracks in the tower header bar ("Warranty Fatigue Issue"). *Exhibit B*, 127:3-129:9. But the tower which broke when LaJuene drove the boat into a concrete column at 30 plus miles per hour broke from a <u>ductile crack</u> caused by a single load. *Exhibit B,* 209:20-210:10. In other words, the subject boat ran into a concrete bridge column - and the force of such - caused the tower to break from that single load. The tower did <u>not</u> break from fatigue cracks. <u>This fact is not in contention</u>.

Specifically, Minden opined that the single load from the impact with the concrete bridge column caused the starboard header bars to crack and separate from the arm of the tower. *Exhibit A*, Pg 64. The tower then swung to the port side of the tower, collapsing within the subject boat. *Exhibit A*, Pg 64. Minden does not know what that single load was, but testified it was a ductile break, not fatigue. *Exhibit B,* 209:20-210:10. His reliance, therefore, on the Warranty Fatigue Issue is confounding. Accordingly, his reasoning and methodology were not properly applied to the facts in issue.

Additionally, Minden lacks the most basic information about any of the claims the subject of the Warranty Fatigue Issue, and none are admissible. For example, he knows the claims which

13

are the subject of the Warranty Fatigue Issue resulted from fatigue and that they mostly occurred in the single header bar. But he is not aware of the forces which caused the fatigue, how boats were being operated or under what sea conditions they were being operated. He knows only that a boat owner made a complaint about fatigue crack(s), and that there exist photographs of many of these fatigue cracks. *Exhibit B*, 221:9-24. But in a product liability case, evidence of an accident similar in nature to that which injured the plaintiff is admissible provided the evidence is relevant and sufficiently similar to the injury-causing accident so as to outweigh concerns of undue prejudice and confusion of the issues. *Thornton v. Gray Auto. Parts Co.,* 62 S.W.3d 575, 583 (Mo.App. W.D.2001). To be sufficiently similar, each occurrence must: (1) be of like character; (2) occur under substantially the same circumstances; and (3) result from the same cause as that alleged to have caused the accident in question. *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 10 (Mo. Ct. App. 2006), opinion adopted and reinstated after retransfer (Oct. 2, 2006).

Here, the prior incidents are admittedly dissimilar. There is no dispute that they occurred under fatigue, not a single load. They presumably occurred under normal operating conditions, even though the sea conditions are unknown and operator conditions are unknown. But the break in the tower during the LaJuene Accident resulted not from a fatigue crack, or fatigue pulses, but from a single load resulting from a collision with a fixed concrete bridge column.

Minden also agrees the emails between Xtreme and Chaparral about the Warranty Fatigue Issue were addressing tower shaking, fatigue cracks, or a clicking noise that developed from an electronic cord:

14

```
10        Let me ask it this way:  Every one of the
11   emails that you reference in your report is to
12   address shaking, fatigue cracks or a clicking
13   noise or clacking noise that was developed because
14   of the electronic cords?
15            MR. ELIAS:  Object to the form,
16   misstates the record.
17      A.  Without going back and looking at every
18   one of them, I'm not sure I can --
19      Q.  (By Mr. Hansmann)  As you sit --
20      A.  -- 100 percent agree to that.
21      Q.  That's fair.  I don't want to go through
22   every single one of them, we'll be here all night.
23   Can you think of any as we sit here now that
24   were -- that were intended to address a single
25   load impact with a fixed object?
```
                                          Page 223

```
 1      A.  No.
```

*Exhibit B*, 222:10-223:1.

The fact is the tower collapsed because of a single load impact with a fixed object, resulting in a ductile failure, a separate failure mechanism all together from the Warranty Fatigue Issue, which never resulted in a tower collapse, only a fatigue crack.  Minden agrees the only instance he is aware of in which a tower canopy broke and collapsed was the LaJuene Accident when LaJuene collided with a concrete bridge column at 30 mph. *Exhibit B*, 229:4-15.  Minden's reliance on the Warranty Fatigue Issue to support his opinion is improper.

### C.    Minden made no effort to engage in any testing of his hypotheses.

Minden's opinions are best described as a series of untested hypotheses.  But the court must ensure that his "opinion" is "supported by appropriate validations – i. e., 'good grounds,' based on what is known," and the court must separate valid opinions from "subjective speculation that masquerades as scientific knowledge." *Glastetter,* 252 F.3d at 988-89. Here Minden fails to test any hypotheses, leaving his "opinions" nothing more than *ipse dixit* masquerading as scientific knowledge.  Minden opines that had the tower been properly designed, tested, and manufactured, then the collapse of the tower would not have occurred on June 21, 2021. *Exhibit A*, Pg. 69.  This

15

of course is not a true opinion; it is best described as a hypothesis which needs to be tested – a fact which Minden agrees:

> 9    Q.  Sure.  When you approach any forensic
> 10  case, do you use any type of scientific or
> 11  forensic or any other method?
> 12    A.  Yes.
> 13    Q.  What --
> 14    A.  Basic -- basically the scientific method.
> 15    Q.  And what is that?
> 16    A.  Define the problem, collect the data,
> 17  analyze the data, and then see if that fits what
> 18  took place.
> 19    Q.  And then test the hypothesis, correct?
> 20    A.  Yes.

*Exhibit B*, 65:9-20.

But Minden made no attempt to test his hypotheses regarding any alleged defective nature of the tower.  Consequently, Minden cannot reliably opine the tower collapsed due to any defect, rather than some other reason – such as an impact with the concrete bridge column.  In fact, not knowing the single load the tower saw during the LaJuene Accident, he cannot reliably opine any boat tower could withstand an impact with a concrete bridge column at 30 mph.

> i.      ***Minden made no effort to determine the single load exerted on the tower when it collided with a concrete bridge column at 30 mph.***

Minden hypothesizes the tower is defective because it broke resulting in a canopy collapse after it struck the concrete column at 30 plus miles per hour.  But Minden does not know the force that the tower header experienced in the LaJuene Accident.  *Exhibit B*, 156:5-19.  And he admits he has made no attempt to calculate that force.  *Exhibit B*, 109:11-16.  The fact is Minden is unable to testify:

- What force the tower should be able to withstand, and

- Whether the LaJuene Accident resulted in a force above or below this force.

16

Absent these facts to support his hypothesis, Minden's hypothesis is not supported by appropriate validations or good grounds and are nothing more than subject speculation masquerading as scientific knowledge. *Glastetter,* 252 F.3d at 988-89. This is not an issue of weight for the jury, but an issue of an expert's opinion and hypothesis being completely devoid of support.

About the accident, Minden admits he does not know the speed the boat was traveling at impact, but he did not disagree with the defense expert's opinion that it was traveling in excess of 30 mph. *Exhibit B,* 73:15-75:12. Minden is unaware how far the starboard fiberglass side hull deflected inward at the time of impact. *Exhibit B,* 112:18-22. He also admits he does not know what forces the hull saw in this accident:

> 8    Q.  Do you know what forces were generated in
> 9  this accident to generate that damage?
> 10    A.  No.

*Exhibit B*, 107:8-10.

Instead of testing his hypotheses, Minden makes the incredible statement that the "tower should be made such that it doesn't collapse" in any situation, including in a collision with a bridge. *Exhibit B*, 206:12-20. He makes this statement despite the fact that he knows there are no standards that apply to boat towers or canopies in the American Boat and Yacht Council technical specifications. *Exhibit B*, 32:7-17. And he makes this statement while at the same time admitting that a boat the runs into a concrete bridge is going to sustain damage. He also agrees that if you put enough force on any beam, it is going to deform. See, *Exhibit B*, 204:4-205:25. If Minden agrees that at some force, a ductile material is going to deform / break (which he does), and the tower is made of a ductile material, how then is it not axiomatic that at some force, the tower is going to break? The simple answer is that it is. Minden's *ipse dixit* opinion that the tower should never collapse in any accident, the tower collapsed, therefore it is defective, is the precise type of

17

"opinion" for which this Court should keep the gate closed.  This is not testimony a jury should weight, it is testimony which should never reach the jury.

Instead of testing his hypotheses, Minden offers conclusory opinions that the tower is defective.  As an example, he testified the tower is defective because "Chaparral is a major boat manufacturer, there is no one on staff with an engineering degree". *Exhibit A*, Pg. 25. But he appears to agree that not having a degreed engineer does not make a product defective.  *Exhibit B*, 193:21-194:20.  Moreover, Minden again appears ignorant of any rules or regulations that apply to boat manufacturers:

> 12    Q.  Are you familiar with the ABYC rules that
> 13  require -- what -- and what they require a naval
> 14  architect or an engineer to evaluate on a
> 15  recreational boat?
> 16    A.  No.
> 17    Q.  Do you know any boat manufacturers of
> 18  recreational boats that have a degreed engineer on
> 19  staff?
> 20    A.  No.

*Exhibit B*, 194:12-20

Here, Minden does not know of any standard under which a tower should be designed, does not offer a standard for which he believes a tower should be designed, and does not even know the technical rules and regulations which are guidelines for recreational boat manufacturers. Minden logically then cannot compare the tower to any standard.  Rather, Minden's opinion is it broke so it is defective.

### ii.    *Minden's hypothesis that a lack of stiffness at the base point where the tower connects to the boat somehow contributed to the tower breaking is devoid of any testing or scientific analysis.*

Minden hypothesizes that inadequate stiffness at the gunnel contributed to the tower breaking when the boat collided with the concrete bridge column.  The gunnel is the point where the tower connects to the hull of the subject boat.  Minden hypotheses that if that connection point

18

was stiffer, the tower would not have broken when the boat ran into a concrete bridge column at 30 mph. He hypothesizes that there was too much lateral movement at the base due to a port connection missing a bolt; and the connection did not have a steel plate implemented as a post-sale modification. *Exhibit B*, 129:5-18.

Consistent with his other hypothesis, this hypothesis is untested and pure *ipse dixit*. The hypothesis is devoid of testing or analysis which would suggest a stiffer connection would have, or would not have, resulted in a different outcome in the LaJuene Accident. Even worse, on cross examination he conceded that a stiffer connection may in fact increase the likelihood of failure of the header. *Exhibit B*, 180:16-24; 135:21-136:6. The net result is that on cross examination, Minden's opinion was exposed for what it was, and he admitted he does not know if a stiffer gunnel would have made a difference in this case at all.

On the issue of the missing bolt, Minden testified that during his investigation, he discovered that the port side connection of the tower to the hull of the boat had one less bolt than what the design specification called for. *Exhibit B*, 122:3-123:20. But Minden does not know whether the missing bolt resulted in any different movement at the base. *Id*.; *Exhibit B,* 132:22-133:13. In fact, he agreed this may have had no net effect on the accident at all.

> 7    Q.  And so it's possible that having two
> 8  screws, two bolts, as opposed to three, may have
> 9  had nothing to do with the ultimate net effect in
> 10  this accident?
> 11          MR. ELIAS:  Object to the form.
> 12    A.  Other than it's representative of an
> 13  installation defect.
> 14    Q.  (By Mr. Hansmann)  Other than it's not
> 15  what the spec called for?
> 16    A.  Correct.

*Exhibit B*, 136:7-16.

Consequently the "missing bolt" issue is missing any relevance to this case and is academic only.

Minden also claims the failure to install a steel plate at the base of the tower post-sale prevented the tower from being stiff enough. *Exhibit A*, Pg. 67. After the Warranty Fatigue Issue developed, in January 2020, Xtreme Tower issued an engineering change notice ("ECN") in-house that altered the design of the tower header. *See ECN bate stamped Xtreme 613- 633 attached as Exhibit D*. The ECN changed the horizontal header from a single header to a double header. In February, 2020, for the same reasons, Xtreme issued a separate ECN adding a steel plate at the base of the of the tower. *Id.* All towers Xtreme manufactured after the ECNs incorporated the changes. For boats in the field, if a header sustained a fatigue crack, a field procedure was created to remove the single header and install a double header. The base was not modified. Minden hypotheses that the steel plate would have stiffened up the base. *Exhibit B*, 178:11-179:18. But again, Minden's hypothesis is just that, an untested hypothesis.

Minden again conducted no testing and cannot testify the steel addition would have made a bit of difference to the result in the LaJuene Accident. Restated, Minden cannot state the additional steel at the base would have altered the LaJuene Accident on June 21, 2021.

#30202027 v1

```
 1        Okay.  So what we can say is that your
 2   inspection of the base is that it didn't have the
 3   engineering change notice from 2020, right?
 4      A.   We can say that it did not have it, yes.
 5      Q.   And as a result, it likely wasn't as
 6   stiff as it could have been if it had the
 7   engineering change notice, fair?
 8      A.   Fair.
 9      Q.   But we don't know whether that would have
10   had any different result in the impact?
11           MR. ELIAS:  Object to the form.
12      A.   There would have needed to be some
13   testing done which was not done.
14      Q.   (By Mr. Hansmann)  Okay.  So what I said
15   is true, we don't know whether there's any
16   causative effect in the case at hand, right?
17           MR. ELIAS:  Object to the form.
18      A.   True.
```

*Exhibit B,* 181:1-18.

Again, Minden has nothing more than a hypothesis.  The 8th Circuit Court of Appeals was faced with similar expert opinion in *Pro Service Auto, L.L.C.* In *Pro Service Auto, L.L.C.,* the Staton's purchased a waste oil heater from Lenan Corp. for their commercial automotive garage. *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1212 (8th Cir. 2006). In 2003 and 2004, the Statons contacted Lenan Corp. several times complaining of issues with the waste oil heater. *Id.* On February 29, 2004, the building burned down and the Statons claimed the heater caused the fire. *Id.* Statons retained Alan Bullerdiek, a chemical engineer and heating equipment expert, to offer opinions regarding the defect of the product and causation. *Id.* at 1213. The defense moved to exclude Bullerdiek pursuant to *Daubert* which was granted and the appeal followed. *Id.*

The 8th Circuit Court of Appeals upheld Bullerdiek's exclusion. The Court noted that Bullerdiek provided no testing or other engineering analysis to support his causation opinion. *Id.* at 1215. He relied on his expertise to state that the hole could cause a localized temperature rise at undefined points *inside* the heater but made no attempt to calculate where or how hot these "hot

21

spots" would be, much less identify a known or potential error rate for his analysis. *Id.* He then theorized that these unlocated and unquantified hot spots could result in a series of radiative or convective transfers of heat through the heater cabinet that eventually would reach the environment in sufficient amounts to ignite nearby combustibles. *Id.* However, he provided no testing or mathematical analysis to quantify, even as a rough estimate, how much heat would be transferred through these processes and how it would compare to the heat necessary to ignite the combustibles. *Id.* In lieu of any analysis or testing to show that the heater, after functioning perhaps for weeks with a hole in the target wall, could actually ignite nearby combustibles, Bullerdiek offered only vague theorizing based upon general principles. *Id.* at 1215-1216. Where "opinion evidence ... is connected to existing data only by the *ipse dixit* of the expert," a district court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.,* 522 U.S. at 146.

Here, Minden suffers from the same *ipse dixit* testimony as Bullerdiek. He claims the lack of a singular bolt on the port base caused the tower to be less stiff as it otherwise should have been. He similarly opines the lack of a steel plate at the base prevented the tower from being as stiff as it could have otherwise been. But like *Pro Service Auto, L.L.C.,* Minden has hypotheses but no testing or mathematical analysis regarding whether a second bolt or added steel 1) makes the base more stiff, or 2) whether a more stiff base would have somehow prevented the tower from breaking in the accident. Instead, Minden again admits that he would have to do testing, testing that has never been done. *Exhibit B*, 181:1-18.

In fact, Minden even concedes that a stiffer base may have had no impact on the LaJuene Accident at all.

#30202027 v1

```
12    Q.  And then what impact that would have had
13 on the accident, if any, right?
14    A.  Again, all in an attempt to make the base
15 of the tower arm stiffer and stronger.
16    Q.  Stiffer, but we can't say if it was as
17 stiff as it could possibly be, the net result of
18 this accident would have -- would have had a
19 different result, correct?
20        MR. ELIAS:  Object to the form.
21    A.  No.
22    Q.  (By Mr. Hansmann)  We can't say that; is
23 that true?
24    A.  True.
```

*Exhibit B*, 180:12-24.

When asked if two boats – one with a fixed base completely stiff, and the subject boat – run into a bridge, which would receive more force to the tower header, Minden's response was "I don't know as I sit here today. I'd have to analyze that." *Exhibit B*, 132:19-133:13.  In fact, Minden even agreed that a fixed or stiffer connection at the base may actually result in a greater load to the header because some of the force is not absorbed by the base. *Exhibit B*, 135:14-136:16. Finally capitulating on the issue, Minden agreed the stiffness of the base from the bolts may have had no net effect on the accident at all, other than being and installation defect. *Id.*  This Court should close the gate on this opinion.

   iii.  *Minden does not know if the flat gunnel had anything to do with the tower collapsing in the accident.*

Apart from the stiffness of the gunnel, Minden also hypothesizes that a lack of testing of the connection point at the gunnel was changed from an angled connection point to a flat connection point, and that somehow the lack of testing for this change contributed to the tower breaking in the LaJuene Accident.  By way of background, the base of the tower was initially designed for an angle gunnel.  But the subject boat had a flat gunnel.  Minden hypotheses that Chaparral failed to adequately test the tower when it was changed from an angle to a flat

connection, and that this may have affected the tower. But he is unable to explain whether there is a difference in the performance of the tower, what the difference would be, and whether it had some impact on the LaJuene Accident.

> 7    Q.  (By Mr. Hansmann)  I think I already
> 8  asked you this earlier, but do you know what
> 9  affect the angled gunnel had versus a flat gunnel
> 10  on the tower performance?
> 11    A.  No, because they never tested the flat
> 12  one.

*Exhibit B*, 224:7-12.

It may be that Chaparral never saw a need to test the different iteration of base, but neither did Minden, and Minden is the one hypothesizing the lack of testing caused or contributed to cause the tower to break. When questioned how he could claim the lack of testing on the flat gunnel contributed to the accident / tower breaking without knowing what the difference in effect would be between the two, Minden perplexingly replied, "Because it was never tested." *Exhibit B*, 224:18-24. Minden's circular "because it wasn't tested…it -- it didn't have sufficient strength in the lateral direction" is nonsensical. *Exhibit B*, 224:25-225:7. The lack of a test report on one hand does not equate to the lack of strength in the lateral direction or a defect on the other hand.

Minden does not support these opinions with objective proof or independent testing. Instead, he relies on the lack of testing itself coupled with information from Chapparal and Xtreme regarding the need for redesigns. It is Minden's opinion that testing of the tower on the boat would have miraculously prevented the tower from breaking merely by virtue of the testing itself.

> 4    A.  Cumulatively if you take all of these
> 5  contributing factors and you eliminate them, the
> 6  tower stays up.
> 7    Q.  But how do you know that?  And how can
> 8  you provide that opinion?
> 9    A.  Because they would have been -- they
> 10  would have been tested.

*Exhibit B*, 203:4-10.

Rather than test his own hypotheses, for many of his opinions Minden simply recites an email or emails between Chaparral and Xtreme Tower related to the Warranty Fatigue Issue, and then somehow conflates that issue with the LaJuene Accident.  An example is when Xtreme and Chapparal were working through the Warranty Fatigue Issue, Xtreme proposed Xtreme and Chaparral collectively perform on the water testing and then disassemble the tower and look for wear. *Exhibit B*, 223:14-25.  Having no documentation of this testing proposed by Xtreme in the email, Minden concludes "It is the opinion of this investigation the defective design and testing of the electric folding hardtop were contributing factors regarding the collapse of the fiberglass hardtop on June 25th, 2021." *Exhibit B*, 224:13-24.  But Minden never explains 1) what the defect is, or 2) how Xtreme and Chaparral ultimately deciding to limit or not limit their testing equates to a defect.

Minden's folly is exposed in his attempted explanation of this untested hypothesis.  In discussing the same, Minden stated that the angled versus flat gunnel base was not tested, and therefore "it was never tested in a manner that showed the strength in the lateral direction." *Exhibit B,* 224:25-225:23.  From that fact he illogically concludes that because it was not tested, it did not have sufficient strength in the lateral direction.  *Id*.  And from there, he confirms he does not know what strength the boat should have in the lateral direction.  *Id*.

But if Minden did want to know what the strength in the lateral direction should be, he testified his testing protocol would be the following:

> 15    Q.  What force should a tower be able to
> 16  withstand in the lateral direction?  Maybe that's
> 17  the question I should be asking.
> 18    A.  To determine that, I would put
> 19  accelerometers on a boat, drive it in the roughest
> 20  expected condition that I could think of, put it
> 21  through all its paces and use that accelerometer
> 22  data to then input the -- for the testing in the
> 23  lateral direction.
> 24    Q.  Okay.  So then, as I understand it, your
> 25  position would be, run the boat in the roughest

> 1  conditions possible, measure the lateral forces,
> 2  right?
> 3    A.  The accelerations.
> 4    Q.  Okay.  Measure the lateral accelerations
> 5  generated during these roughest conditions, right?
> 6    A.  Yes.
> 7    Q.  And then you would then test the tower
> 8  using those forces to see how it performs in those
> 9  lateral decelerations?
> 10    A.  Accelerations.
> 11    Q.  Accelerations.  Fair?
> 12    A.  Yes.  And then apply some safety factor.

*Exhibit B*, 225:18-226:12.

Minden of course did not do this test, or any other test.  But he did opine that this test would be "sufficient – testing in a sufficient design to put the boat in the water." *Exhibit B*, 226:4-19.  He then testified that even with his recommended testing, he did not know whether the tower would be able to withstand a side impact with a bridge pylon.  Specifically, he stated "It would depend on the magnitude of the impact, and that it is possible it would still break.  *Exhibit B*, 225:18-227:22.

Restated, while Minden hypothesizes on the one hand that the tower should be able to withstand any accident under any condition, he on the other hand testified that even under his ideal

testing conditions for the tower, the tower could still break depending on the magnitude of the accident[3].

### iv. *Minden is critical of the welds on the tower, but does not know if perfect welds on the tower would have resulted in any difference in the tower breaking.*

Minden hypothesizes that the lack of full fusion and penetration between the welds and the side plate of the tower caused or contributed to the tower breaking. *Exhibit B*, 154:23-155:19. It is his opinion that full fusion of those welds "quite possibly" would have made a different result in this accident. *Exhibit B*, 155:16-19. The reality is, Minden has no idea if it would have made a difference. He again is merely hypothesizing but failed to test his hypothesis.

In fact, Minden concedes that for him to offer this opinion he would have to know the force on the tower at the time of impact. *Exhibit B*, 156:5-10. Minden does not know the force on the tower at the time of impact and made no attempt to learn the force. *Exhibit B*, 109:11-16; 156:5-19. It follows then, that he cannot scientifically support this position. Minden agreed that testing would need to be performed to determine if a full fusion and penetration weld would alter the result in this case. *Exhibit B*, 157:21-158:9. Restated it is pure speculation for Minden to say a full penetration weld would or would not have broken when this boat struck the bridge column.

Minden's lack of testing illustrates his mere *ipse dixit* hypotheses.

---

[3] Minden and Derie repeatedly admit they do not know the force and magnitude of the impact at issue in this accident. Therefore, even under Minden's testing, the tower could have broken during the accident at issue.

```
 6     A.  Right.  No testing was ever done on the
 7  design.
 8     Q.  By anyone?
 9     A.  Correct.
10     Q.  And no testing was done by anyone in the
11  course of this case to determine what those forces
12  or loads would have been to tell us whether that
13  weld would have held in Figure 115 even if it was
14  a full penetration weld?
15     A.  Can you read that back?
16         (The requested portion of the
17      record was read.)
18     A.  Correct.
```

*Exhibit B*, 158:6-18.

Minden chose not to conduct the testing which would have permitted him to understand the loads on the tower at the time of impact. Consequently, Minden cannot reliability opine that a stiffer base, or full penetration welds, would have withstood the forces of the accident.

## **CONCLUSION**

Minden has performed several investigations and inspections of the boat. He has documented his findings, and from there developed hypotheses as to potential defects in the subject boat. And it is here he stopped. He has not tested any of his hypothesis, and agrees that in order to prove his opinions, he would need to test his hypotheses.

Minden's reliance on the Warranty Fatigue Issue is improper. The Warranty Fatigue Issue related to fatigue cracks developing in the header bar due to cyclical pulses and forces. None resulted in a collapse of the canopy, or anything close. Chaparral and Xtreme's emails back and forth addressing the Warranty Fatigue Issue are unrelated to the LaJuene Accident, which was caused by a ductile break in the header, which resulted in a collapse of the tower. Grasping this red hearing, Minden merely acts as a scrivener re-writing the Chaparral and Xtreme's emails dealing with fatigue, and claims such caused or contributed to cause the tower break in the LaJuene

28

Accident, even though the Warranty Fatigue Issue were fatigue cracks, and the LaJuene Accident is a ductile crack.

But the unreliability in Minden's opinions is glaring. He has performed no testing and cannot testify a stiffer gunnel would have had any different result in this case. Not knowing the force that acted upon the tower header, Minden cannot say whether a full penetration weld would have had a different result in this case. Minden offered his opinion of how the tower should have been tested, and even still testified that even under his testing conditions, he cannot testify whether the boat tower would have broken under the forces involved in the collision with the bridge.

The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. Under *Daubert*, U.S. District Courts must act as gatekeepers to "insure that proffered expert testimony is both relevant and reliable." *Anderson,* 340 F.3d at 523. The court must ensure that expert opinion is "supported by appropriate validations – i. e., 'good grounds,' based on what is known," and the court must separate valid opinions from "subjective speculation that masquerades as scientific knowledge." *Glastetter,* 252 F.3d at 988-89.

When determining the reliability of a proffered expert's opinion, courts have discounted the reliability of experts who formed their opinions only within the context of litigation. *Nelson,* 92 F. Supp. 2d at 967. If the proffered expert testimony is not based on independent research, the party must come forward with other ***objective, verifiable evidence that the testimony is based on "scientifically valid principles."*** *Daubert,* 43 F.3d at 1317-1318.

Here, Minden offers nothing more than hypotheses. He worked backward concluding the tower to be defective simply because it broke. However, he has not properly discounted other factors that may have caused/contributed to cause the tower's collapse, such as the boat driving into a concrete bridge at 30 miles per hour. While Minden admits that damage does not equate to defect, the root of all his opinions rest on the pure fact the subject tower broke, therefore it is

29

defective.  This type of conclusion is self-serving and not a reliable basis to opine the tower was defective.  This Court should close the gate on Minden's opinions.  Minden's opinions do **not** go to the weight of the testimony.

**WHEREFORE**, Defendant prays that this Court grant its Motion to Exclude Expert Testimony from Kyle Minden, as well as grant such further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

**WATTERS WOLF BUB & HANSMANN, LLC**

*/s/ Bradley R. Hansmann*
Bradley R. Hansmann #53160
Daniel P. Hunkins #69147
600 Kellwood Pkwy, Suite 120
St. Louis, MO 63017
(636) 798-0570
(636) 798-0693 - Fax
bhansmann@wwbhlaw.com
dhunkins@wwbhlaw.com
*Attorneys for Defendant Chaparral Boats, Inc.*

**CERTIFICATE OF SERVICE AND**
**CERTIFICATE OF COMPLIANCE WITH RULE 55.03(a)**

The undersigned certifies that a true and correct copy of the foregoing was served by the Court's electronic filing system on this 15th day of February, 2023 on counsel of record. In addition, the undersigned counsel certifies under Rule 55.03(a) of the Missouri Rules of Civil Procedure that he has signed the original of this Certificate and the foregoing pleading.

Richard M. Elias
Elias, LLC
231 S. Bemiston, Suite 800
St. Louis, MO 63105
relias@eliasllc.com
*Attorney for Plaintiffs*

Mark Niemeyer
Niemeyer, Grebel & Kruse
211 N. Broadway, Suite 2950
St. Louis, MO 63102
niemeyer@ngklawfirm.com
*Attorney for Plaintiffs*

Bradley C. Nielsen
Christopher C. Brackman
8900 Ward Parkway
Kansas City, MO 64114
(816) 421-7100 Phone
(816) 421-7915 Fax
bnielsen@fsmlawfirm.com
cbrackman@fsmlawfirm.com
*Attorneys for Third-Party Defendant C&C Riding the Waves, LLC f/k/a Premier 54 Motor Sports, LLC*

Brian R. Shank
Evans & Dixon-StL
211 N. Broadway, Ste. 2500
St. Louis, MO 63102
bshank@evans-dixon.com
*Attorney for Defendant Xtreme Marine Corporation*

*/s/ Bradley R. Hansmann*

#30202027 v1